## In re RENT–WAY SECURITIES LITIGATION.

### Civil Action 00–323 Erie.

United States District Court,
W.D. Pennsylvania,
Erie Division.

July 11, 2002.

*Id.* The destruction of the Blazer prejudiced defendant precisely in this manner.

Bruce W. Bernard, Bernard, Stuczynski & Bonanti, Erie, PA, Solomon B. Cera, Gold, Bennett, Cera & Sidener, LLP, San Francisco, CA, for Plaintiffs.

Kevin M. Kearney, Hodgson Russ, Buffalo, NY, Paul M. Pohl, Bryan D. Kocher, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Frederick W. Thieman, Thieman & Kaufman, Pittsburgh, PA, Timothy M. Sennett, Knox, McLaughlin, Gornall & Sennett, Erie, PA, John L. Oberdorfer, Lanny Davis, Patton Boggs, Washington, DC, Robert N. Rapp, Calfee, Halter & Griswold, Cleveland, OH, T. Warren Jones, MacDonald, Illig, Jones & Britton, Erie, PA, Robert J. Kopecky, Kirkland & Ellis, Chicago, IL, for Defendants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

This case is a securities fraud class action in which shareholders of Rent–Way, Inc. ("Rent–Way") seek relief from the company, certain of its current and former officers and directors, and its accounting firm, PricewaterhouseCoopers, LLP ("PwC"). All of the Defendants have filed motions to dismiss the Amended Consolidated Class Action Complaint ("Am. Cmplt.") that are presently pending in this Court. For the reasons set forth below, we will deny the motions filed by PwC, William E. Morgenstern, Jeffrey A. Conway, Matthew J. Marini and Rent–Way [Doc. Nos. 56, 58, 60, 63, and 69]. We will grant in part and deny in part the motion filed by William A. McDonnell [Doc. No. 62].

### I. Background

Rent–Way, a company in the business of renting home furnishings, appliances and other merchandise under full-service rental-purchase agreements, began in 1981 when it opened one store in Erie, Pennsyl-

vania. By 1993, the year of its initial public offering, it had expanded to 19 stores in three states. Thereafter, the company dramatically accelerated the pace of its expansion. In December of 1998, Rent–Way doubled its size and became the second largest company of its kind in the United States when it acquired Home Choice Holdings, Inc. Am. Cmplt. ¶ 33. By the year 2000, Rent–Way owned and operated more than 1100 stores nationwide, compared to a mere 125 stores less than two years earlier. Am. Cmplt. ¶ 48. The class members in this action purchased Rent–Way stock during the height of the rapid expansion, specifically between December 10, 1998 and October 27, 2000, inclusive. Am. Cmplt. ¶ 1. During the class period, the common stock (symbolized on the New York Stock Exchange by "RWY"), traded for as much as $32 per share. Am. Cmplt. ¶ 4.

On Monday, October 30, 2000, Rent–Way issued a press release announcing that it was "investigating certain accounting matters, including possible accounting irregularities, which if confirmed would result in the need to revise earlier reported unaudited financial results for fiscal year 2000." Rent–Way also indicated in this release that it expected the same matters to impact its fourth quarter 2000 results. In part, the release provided that:

> [b]ased on its preliminary investigation to date, however, Rent–Way expects these matters to have a negative, noncash impact of between $25 million and $35 million pre-tax on fiscal year 2000 earnings. Based on its preliminary investigation to date, Rent–Way expects that no fiscal periods prior to fiscal year 2000 will be affected. Rent–Way had previously announced that it expected to meet consensus analyst estimates for fully diluted earnings per share of $1.83 in fiscal year 2000. Based on its preliminary investigation to date and taking into account the expected impact of

these accounting matters, Rent–Way believes it will report fully diluted earnings per share of between $0.88 and $1.14 per share for fiscal year 2000.

Am. Cmplt. ¶ 58. Immediately after this release issued, Rent–Way stock declined more than 80% in the course of one day, plummeting from $23–7/16 per share to close at $5.00 per share. Rent–Way eventually disclosed that the accounting irregularities had a far more substantial impact on its fiscal year 2000 earnings than it originally predicted and that the irregularities also impacted its reported results for fiscal years 1998 and 1999. Am. Cmplt. ¶¶ 70–72. In its annual Form 10–K report for fiscal year 2000, Rent–Way reported that the total amount of adjustments affecting pre-tax operating income relating to the accounting improprieties was almost $98 million for all three years. Of this amount, $74.3 million applied to fiscal year 2000, $21.0 million applied to fiscal year 1999 and $2.3 million applied to fiscal year 1998. Additional adjustments totaling $24.5 million were made for fiscal year 2000 for other reasons.

Plaintiffs' 75–page, 161–paragraph Amended Complaint contains numerous allegations that we will more fully set forth in our respective discussions of each Defendant's motion to dismiss. Briefly, however, Plaintiffs' claims may be summarized as follows. In Count I, Plaintiffs allege that each Defendant violated Section 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by disseminating materially false and misleading statements concerning Rent–Way's earnings, profitability and financial condition during the class period. The Rent–Way statements they allege to have been false and misleading include the originally reported year-end reports for fiscal years 1998 and 1999 and the fiscal quarter-end results for all of the quarters

of 1999 and the first three quarters of 2000. Am. Cmplt. ¶¶ 108–135. In its annual report for fiscal year 2000 and on its Form 10–K filed with the SEC, Rent–Way admitted that all of these statements were in fact false. Separate statements made by some of the individual defendants during the class period are also identified. Plaintiffs further assert that PwC falsely represented in its 1998 and 1999 audit opinions that Rent–Way's financial statements had been prepared in accordance with GAAP and that its audits had been performed in accordance with GAAS, and that it reviewed and approved of Rent–Way's false quarterly reports. Am. Cmplt. ¶¶ 74, 92. Plaintiffs assert that Rent–Way's internal accounting structure was severely deficient and that the Rent–Way Defendants knew of and used this fact to manipulate the appearance of the company's financial condition so that it could continue its acquisition practices. In this regard, Plaintiffs claim that Marini, Rent–Way's controller, manually altered numerous entries on the company's ledger prior to the year-end and quarter cut-off dates. They also allege that PwC knew of Rent–Way's fraudulent practices and of the severe deficiencies in the accounting system but failed to properly fulfill its obligations as auditor because it was not independent from its client. In Count II, Plaintiffs allege that the individual Defendants (Morgenstern, Marini, Conway and McDonnell) are liable under Section 20(a) of the Exchange Act because they were "controlling persons" within the meaning of this provision at all relevant times.

## II. STANDARDS OF REVIEW

### A. Motion to Dismiss

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the district court must accept as true all well-pleaded allegations, and must view the facts and inferences to be drawn from the pleadings in the light most favorable to the nonmoving party. *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 406 (3d Cir.1993) (citation omitted). The proper inquiry is "whether relief could be granted ... 'under any set of facts that could be proved consistent with the allegations.'" *Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 71 (3d Cir.1994) (*quoting National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)). Judgment will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Regalbuto v. City of Philadelphia*, 937 F.Supp. 374, 377 (E.D.Pa.1995) (*citing Inst. for Scientific Info., Inc. v. Gordon and Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir.1991), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991). In deciding motions to dismiss, courts generally consider only the allegations in the complaint, exhibits attached thereto and matters of public record. *Pension Benefit Guar. v. White Consolidated Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994)). A district court may, however, consider the factual allegations within other documents, including those described or identified in the complaint and matters of public record, if the plaintiff's claims are based upon those documents. *Id.; In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir.1996). In these instances, the court is not required to construe the motions to dismiss as motions for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997).

### B. Section 10(b) and Rule 10b–5

Section 10(b) makes it "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the

purchase of any security ... any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b–5 in turn prohibits the "employ[ment of] any device, scheme, or artifice to defraud" and the "mak[ing of] any untrue statement of a material fact or [the omission of] a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a securities fraud claim under Section 10(b) and Rule 10b–5, a private plaintiff must plead: (1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir.1996); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir.1999).

■ Section 20(a) imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder ..." 15 U.S.C. § 78t(a). The statute requires proof not only that "one person controlled another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.1992), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (*citing Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440–41 n. 8 (9th Cir.1987)).

### C. Federal Rule of Civil Procedure 9(b) and The Private Litigation Reform Act of 1995 ("PSLRA")

■ Because this is a securities fraud case, Plaintiffs' Amended Complaint must also comply with the special pleading rules set forth in Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b), applicable to all averments of fraud or mistake, requires that the "circumstances constituting fraud or mistake shall be stated with particularity," but permits "[m]alice, intent, knowledge, and other condition of mind of a person [to] be averred generally." Fed.R.Civ.P. 9(b). The PSLRA, applicable to securities fraud cases, further heightens the pleading standard germane to Plaintiffs' claims. Under the PSLRA, the "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, the PSLRA mandates that the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Subsequent to the PSLRA's enactment, the Court of Appeals for the Third Circuit held that it is sufficient for plaintiffs to plead scienter by alleging facts either "establishing a motive and an opportunity to commit fraud" or that "constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta,* 180 F.3d 525, 534–535 (*quoting Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3d Cir. 1997)). A reckless statement is one " 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* At 535. (*quoting McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)). Con-

scious misbehavior may be alleged by "stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." *Id.*

### III. DISCUSSION

#### I. Section 10(b) and Rule 10b–5

##### A. PricewaterhouseCoopers ("PwC")

Plaintiffs allege that PwC falsely reported in its audit opinions for fiscal years 1998 and 1999 that Rent–Way's financial statements fairly presented its financial condition and results in accordance with Generally Accepted Accounting Principles ("GAAP").[1] Plaintiffs also contend that PwC improperly reviewed and approved of Rent–Way's quarterly financial statements for all of the quarters of fiscal 1999 and the first three quarters of fiscal 2000 and thereafter failed to insist that Rent–Way revise these quarterly statements. Am. Cmplt. ¶¶ 19, 74, 86. It is alleged that PwC routinely ignored a number of "red flag" warnings, including a materially weak internal accounting structure, incompatible and nonfunctional accounting systems, reports of declining expense ratios during periods of rapid growth through acquisition, a lack of adequate ledger detail that allegedly prevented PwC from cross-checking Rent–Way's calculations (*i.e.,* documentation regarding vendor rebates and merchandise depreciation was never generated and provided to PwC), and the

fact that Marini, Rent–Way's controller, manually adjusted and created entries on the company's ledger in order to make the bottom line numbers balance. Am. Cmplt. ¶¶ 77, 79, 88, 100–101.

Specifically, Plaintiffs allege that the Point-of-Sale ("POS") accounting system utilized by Rent–Way was unable to handle the company's growth and functioned improperly. Plaintiffs state that one former Rent–Way accountant said that, "[t]he whole place [Rent–Way] was a red flag." Am. Cmplt. ¶ 35. They also allege that a former Rent–Way employee said the POS system was easy to manipulate because it was "held together by rubber bands." Am. Cmplt. ¶ 36. Rent–Way's own financial analysts distrusted the company's profit/loss statements and knew that they did not reflect the company's performance. Am. Cmplt. ¶ 38. It is alleged that the POS system accounted for rental merchandise depreciation, the second greatest expense on the company's ledger, differently among the company's stores. Am. Cmplt. ¶ 37. Plaintiffs also allege that PwC knew and approved of the fact that Marini made manual adjustments to Rent–Way's ledger at the ends of fiscal years 1998 and 1999. Am. Cmplt. ¶ 45. It is alleged that PwC knew or recklessly disregarded that Rent–Way intentionally failed to record vendor rebates in order to falsely reduce other unrelated expenses and intentionally overbooked the value of acquired assets for the

---

1. GAAP are the "basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ('AICPA') and establish guidelines for measuring, recording, and classifying the transactions of a business entity." *Jacobs v. Coopers & Lybrand, L.L.P.,* No. 99 Civ. 3374(RPP), 1999 WL 101772, *1 n. 3, 1999 U.S. Dist. LEXIS 2102 at *6 n. 3 (S.D.N.Y. March 1, 1999). Generally Accepted Accounting Standards ("GAAS"), mentioned later in this opinion, are the "standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination ... Rule 202 of the Rules of Conduct of Professional Ethics of the AICPA requires members to comply with GAAP and GAAS when giving an opinion on financial statements." *In re Ikon Office Solutions, Inc. Sec. Litig.,* 66 F.Supp.2d 622, 626 n. 3 (E.D.Pa.1999) (quoting *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1222–1223 n. 17 (S.D.N.Y.1992)).

same reason. Am. Cmplt. ¶¶ 47, 49. Plaintiffs also allege that the PeopleSoft system, which Rent–Way began to install in August, 1999, failed to interface with the POS system and also failed to operate properly; it is asserted that this system failed to properly account for invoices, misallocated payroll expenses and failed to record fixed assets for the first six months after it had been installed. Am. Cmplt. ¶¶ 42–44. They allege that a Rent–Way staffer who worked at the company for most of the class period stated that, "[t]here was never one correct financial statement produced at Rent–Way during the entire time I was there." Am. Cmplt. ¶ 44. It is alleged that PwC also was aware that the PeopleSoft system never functioned properly. Am. Cmplt. ¶ 42.

Plaintiffs allege that PwC violated GAAS by failing to insist that Rent–Way revise its interim results for each of the fiscal 1999 quarterly periods and the first three fiscal 2000 quarterly periods. Am. Cmplt. ¶ 86. They also allege that PwC violated GAAS by relying on Excel spreadsheets and reconciliation trial balances in the course of its audits instead of obtaining adequate general ledger detail and in failing to expand its audit procedures in light of Rent–Way's weak internal controls. Am. Cmplt. ¶ 79.[2] Plaintiffs allege that some Rent–Way employees concluded that PwC had simply delegated its audit responsibilities to Marini, Rent–Way's Controller and Chief Accounting Officer. Am. Cmplt. ¶ 53.

It is further alleged that PwC had motive and opportunity to commit fraud because it desired to retain Rent–Way as a client and to secure more lucrative consulting business from it in the future. Am.

Cmplt. ¶ 81. They contend that PwC lacked independence from Rent–Way because the engaged partners' fees were directly tied to the account, and Rick Krause, the partner in charge, was close friends with Marini and interviewed for the Chief Financial Officer position at Rent–Way during the class period. Am. Cmplt. ¶ 81. Plaintiffs also assert that during the course of the 1999 year-end audit, Colleen Kipfstuhl, a PwC staff accountant, confronted Morganstern about perceived accounting irregularities and a lack of adequate documentation, and that PwC subsequently removed her from the account at Marini's request. Am. Cmplt. ¶ 80.

In its Motion to Dismiss and supporting memorandum, PwC raises three arguments: (1) that its 1998 and 1999 audit opinions are the only misstatements for which it is potentially liable; (2) that Plaintiffs have not alleged facts to support a strong inference that it acted with the requisite state of mind as required by the PSLRA; and (3) that Plaintiffs have not alleged that any misstatements made by PwC caused their loss. We will examine each of these arguments in turn.

1. Potentially Actionable Misstatements

PwC first argues that under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), it may not be held liable for the misstatements in Rent–Way's 1999 and 2000 unaudited quarterly reports. In *Central Bank*, the United States Supreme Court put an end to aiding and abetting liability under Section 10(b) and Rule 10b–5:

---

**2.** In paragraph 95 of the Amended Complaint, Plaintiffs list ten GAAS standards that PwC allegedly violated by issuing its audit opinions, refusing to modify its audit opinions or both. We find it unnecessary to list these standards here, and will address this paragraph of the Amended Complaint more fully when we address the adequacy of Plaintiffs' pleading relevant to PwC's scienter.

[b]ecause the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability are met. In any complex securities fraud, moreover, there are likely to be multiple violators ...

*Id.* at 191, 114 S.Ct. 1439 (internal citation omitted).

Since *Central Bank,* however, the parameters of primary liability for accountants and other secondary professionals have been anything but clear. *See* Lewis D. Lowenfels and Alan R. Bromberg, *Liabilities of Lawyers and Accountants Under Rule 10b–5,* 53 Bus. Law. 1157, 1158 (1998) (noting that three lines of cases have developed since *Central Bank* ). While there has been no question that accountants' own misstatements that reach investors provide a basis for liability, there has been disagreement as to whether an auditor's "substantial participation" (itself a less than well defined concept) in the creation of a misstatement publicly attributable to another is sufficient. The "bright-line" view is well-articulated in *Anixter v. Home–Stake Production Co.,* 77 F.3d 1215 (10th Cir.1996), in which an accountant both assisted in the preparation of his client's prospectuses and issued his own opinion letters on the company's financial data and consolidated financial statements. The court noted that much of the evidence could have sustained a finding of primary liability, but not all of it:

[r]eading the language of § 10(b) and 10b–5 through the lens of *Central Bank of Denver,* we conclude that in order for accountants to "use or employ" a "deception" actionable under the antifraud law, they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors ... this rule, though far from a bright line, provides more guidance to litigants than a rule allowing liability to attach to an accountant or other outside professional who provided "significant" or "substantial" assistance to the representations of others.

*Id.* at 1225, 1226–1227. Numerous other courts, including courts in this circuit, have similarly held that varying levels of participation in another's misstatement do not give rise to primary liability after *Central Bank. See, e.g., Ziemba v. Cascade International, Inc.,* 256 F.3d 1194, 1205–06 (11th Cir.2001) (fact that law firm played a significant role in drafting, creating, or reviewing fraudulent letters or press releases issued by company insufficient for primary liability); *Wright v. Ernst & Young LLP,* 152 F.3d 169, 176 (2d Cir. 1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999) (declining to adopt "substantial participation" test but finding that even if it did, it would be "hard-pressed" to find auditor liable for review of press release when release made no mention of auditor and noted that the announced information was unaudited); *Danis v. USN Communications, Inc.,* 121 F.Supp.2d 1183, 1193 (N.D.Ill.2000) (auditor not primarily liable for reviewing company's unaudited quarterly financial statements; to be liable, auditor was required to have actually made the material misstatements or to have engaged in manipulative behavior); *In re Ikon Office Solutions, Inc.,* 131 F.Supp.2d 680, 685 n. 5 (E.D.Pa.2001), *aff'd,* 277 F.3d 658 (3d Cir. 2002) (held, citing *Wright,* that auditor's

approval of press release did not provide a basis for Section 10(b) liability); *Copland v. Grumet*, 88 F.Supp.2d 326, 332 (D.N.J. 1999) (auditor's role in formulating, preparing and/or compiling false financial data issued by client not a basis for liability); *In re Kendall Square Research Corp. Sec. Litig.*, 868 F.Supp. 26, 28 (D.Mass.1994) (allegations that auditor reviewed and approved of quarterly financial statements and prospectuses constituted at most aiding and abetting and was not actionable under Section 10(b)); *Vosgerichian v. Commodore International*, 862 F.Supp. 1371, 1377–1378 (E.D.Pa.1994) (allegation that auditor gave its guidance and approval to client, and directly and substantially assisted client in misrepresenting the true nature of its transactions not sufficient for primary liability).

The contrary view is represented in *In re Software Toolworks, Inc.*, 50 F.3d 615 (9th Cir.1994), *cert. denied*, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995) which reversed a district court opinion granting summary judgment for an accounting firm that had participated in the drafting of two letters sent by Software Toolworks to the SEC. *Id.* at 628–629. The court found that a reasonable factfinder could have concluded based upon this participation that the accountants "had access to all information that was available and deliberately chose to conceal the truth." *Id.* at 629; *see also In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 970 (C.D.Cal.1994) (evidence of auditor's involvement in creation of allegedly misleading statements released to the public by Z Best created a question of fact regarding primary liability); *Adam v. Silicon Valley Bancshares*, 884 F.Supp. 1398, 1401 (N.D.Cal.1995) (plaintiffs could allege primary liability against accountant based upon various statements and reports issued by company); *Cashman v. Coopers & Lybrand*, 877 F.Supp. 425, 432 (N.D.Ill. 1995) (primary liability may be based on accountant's "central involvement" in preparation of misstatements); *Employers Ins. of Wausau v. Musick, Peeler & Garrett*, 871 F.Supp. 381, 389 (S.D.Cal.1994) (sufficient that plaintiffs pled that accountants were architects of prospectus and that the prospectus contained misrepresentations attributable to the accountants).

■ We find that *Central Bank* precludes holding PwC liable based on its review and approval of Rent–Way's unaudited 1999 and 2000 quarterly reports. Significantly, these statements were prepared and issued solely by Rent–Way, and consequently contained no misrepresentations attributable to PwC upon which investors could have relied. *See Central Bank*, 511 U.S. at 180, 114 S.Ct. 1439 ("Our reasoning is confirmed by the fact that respondents' argument would impose 10b–5 aiding and abetting liability when at least one element critical for recovery under 10b–5 is absent: reliance"); *Wright*, 152 F.3d at 175 ( ... "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act ...").

We also find that 17 C.F.R. § 210.10–01(d), effective March 15, 2000 and applicable to Rent–Way's quarterly financial statements for the second and third quarters of 2000, in no way alters our conclusion on this point. In its entirety, this rule provides:

(d) *Interim review by independent public accountant.* Prior to filing, interim financial statements included in quarterly reports on Form 10–Q (17 CFR 249.308(a)) must be reviewed by an independent public accountant using professional standards and procedures for conducting such reviews, as established by generally accepted auditing standards, as may be modified or supplemented by the Commission. *If, in any filing, the*

*company states that interim financial statements have been reviewed by an independent public accountant, a report of the accountant on the review must be filed with the interim·financial statements.*

17 C.F.R. § 210.10–01(d) (emphasis added). This regulation does not mandate that accountants author reports on quarterly financial statements in the absence of an affirmative representation by the reporting company that its interim statement was reviewed, and no such report was authored in this case. As in *Wright,* the quarterly statements contained a notation that they were unaudited and PwC was not identified in them. Here, Rent–Way was the sole drafter and issuer and the allegation that PwC reviewed and approved the statements remains insufficient to permit an affirmative finding on the element of reliance critical to a Section 10(b) and Rule 10b–5 claim.

■ Plaintiffs' argument that PwC had a duty to insist that Rent–Way's quarterly statements·be revised is similarly unavailing. Initially, Rule 10b–5 states that it is unlawful to make a material misstatement or to "omit to state a material fact necessary *in order to make the statements made,* in the light of the circumstances under which they were made, not misleading." (emphasis added). As we have already discussed, PwC was not. the maker of the quarterly statements and cannot be responsible for omissions in statements that it itself did not make. *See Wafra*

*Leasing Corp. v. Prime Capital Corp.,* 192 F.Supp.2d 852, 867 (N.D.Ill.2002) ("... a defendant is liable only for those omissions that make its *own* statements misleading."). Further regarding omissions, the United States Supreme Court has itself stated that there "can be no fraud absent a duty to speak." *Central Bank,* 511 U.S. at 174, 114 S.Ct. 1439. Here, Plaintiffs cite GAAS standard AU §§ 722.20–.22 for the proposition that PwC was obligated to insist that Rent–Way revise its quarterly reports. This standard requires accountants to discuss discovered accounting problems with certain levels of management and, if appropriate, to consider resigning from an engagement in the event of such a·discovery. It does not by its term impose a broader duty as Plaintiffs suggest. As the Court of Appeals for the Seventh Circuit stated, "[a]lthough accountants must exercise care in giving opinions on the accuracy and adequacy of firms' financial statements, they owe no broader duty to search and sing." *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *see also Wafra,* 192 F.Supp.2d at 868.

Plaintiffs also argue that PwC is liable for Rent–Way's quarterly financial statements under subsections (a) and (c) of Rule 10b–5 because it employed a "device, scheme or artifice to defraud" and "engaged in acts, .practices and a course of business which operated as a fraud and deceit" upon the Plaintiffs.[3] Am. Cmplt.

---

**3.** The prohibition on the making of a material misstatement or omission is found in subsection (b) of Rule 10b–5. The rule in its entirety, however, provides that:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

¶ 147. They contend that it is not necessary to attribute a particular misstatement to PwC under these clauses, and our research on the point has revealed that there is a considerable amount of confusion surrounding this area of the law.[4] Even assuming, however, that a material misstatement or omission is not a requirement for liability under these clauses, we find that Plaintiffs allegations are insufficient to state a claim under them. Fairly read, the Amended Complaint is based upon the misstatements issued by PwC and Rent–Way during the class period. These misstatements are what the Plaintiffs allegedly relied upon to their detriment, and the allegations simply do not permit an inference that Plaintiffs relied upon any "device," "scheme," "artifice," "act," "practice" or "course of business" employed or engaged in by PwC such that a Rule 10b–5 claim could be established. Essentially, as we understand Plaintiffs' argument on this point, they seek to impose liability on PwC for aiding Rent–Way's issuance of the false quarterly statements notwithstanding that Rent–Way itself authored and issued these statements. Such secondary liability has been foreclosed since *Central Bank.* Additionally on this point, Plaintiffs' factual allegations fail to specify with any degree of particularity how PwC violated these clauses, and we accordingly also find that Plaintiffs' allegations in this respect fail to meet the applicable pleading requirements.

In conclusion, we find that Plaintiffs have failed to state a Section 10(b) and Rule 10b–5 claim against PwC based upon the 1999 and 2000 unaudited interim financial statements issued by Rent–Way. Having determined that PwC's potential liability is limited to its own 1998 and 1999 year-end audit opinions, we will now turn to the firm's remaining arguments.

### 2. Scienter

As we have stated previously, it is sufficient for plaintiffs to plead scienter by alleging "facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'" *In re Advanta,* 180 F.3d at 534–535. In this Circuit, allegations of recklessness are sufficient when the reckless acts constitute:

highly unreasonable conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and

17 C.F.R. § 240.10b–5 (2001).

**4.** Our research has revealed confusion concerning the elements of claims brought under the less commonly utilized Rule 10b–5 clauses (a) and (c). See *Peil v. Speiser,* 806 F.2d 1154, 1162 (3d Cir.1986) (noting the "uncertainty surrounding the differences and overlap among the three clauses of Rule 10b–5"). The Court of Appeals for the Third Circuit has set forth the elements of a Rule 10b–5 claim without specifying a particular clause in a misstatement case. *In re Westinghouse Securities Litig.,* 90 F.3d 696, 710 (3d Cir.1996) ("To state a securities fraud claim under section 10(b) and rule 10b–5, a private plaintiff must plead the following elements: (1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage."). At least one court has held that an allegation of a material misrepresentation or omission is necessary to claims brought under clauses (a) and (c) as well as to misstatement or omission claims brought under clause (b). *In the Matter of Lake States Commodities, Inc.,* 936 F.Supp. 1461, 1472 (N.D.Ill.1996), abrogated on other grounds by *Damato v. Hermanson,* 153 F.3d 464 (7th Cir.1998). We do not decide this issue because we find that, regardless of what other elements are necessary for Rule 10b–5 claims under clauses (a) and (c), reliance on the fraudulent conduct is essential and Plaintiffs' allegations are insufficient to establish this element as to PwC for the time period at issue.

which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*In re Ikon Office Solutions Sec. Litig.,* 131 F.Supp.2d 680, 691 (E.D.Pa.2001), *aff'd* 277 F.3d 658 (3d Cir.2002) (*citing McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir. 1979)).

■ Although the Amended Complaint includes allegations regarding PwC's scienter based upon both conscious and reckless behavior, the allegations chiefly run to recklessness and at oral argument Plaintiffs' counsel confirmed that this is the primary basis upon which they rely. Hearing on Defendants' Motions to Dismiss held on April 9, 2002 at 50. Initially, we find that their allegation that PwC had a motive and opportunity to commit fraud because it desired to retain Rent–Way's business is insufficient as a matter of law. Am. Cmplt. ¶ 81. *In re SmarTalk Teleservices Inc. Sec. Litig.,* 124 F.Supp.2d 505, 517–518 (S.D.Ohio 2000) (citing cases and observing that the majority of cases to consider the issue have concluded likewise). Plaintiffs' other factual allegations relevant to reckless or conscious behavior may be summarized as follows: (1) the magnitude and duration of the fraud was significant; (2) PwC committed serial violations of GAAP and GAAS; (3) PwC knew that Rent–Way's internal accounting structure and controls were inadequate; and (4) PwC disregarded a number of "red flags," including reports of declining expense ratios made during periods of substantial growth, a lack of adequate documentation, and Rent–Way personnel's practice of manually altering entries on the company's general ledger. En route to evaluating whether these allegations collectively give rise to a strong inference of scienter, we will consider the probative value of each in turn.

*A. Magnitude and Duration of the Accounting Improprieties*

■ In and of itself, the magnitude of an erroneous financial statement is insufficient to raise a strong inference that a defendant acted with scienter. *In re SCB Computer Technology, Inc. Sec. Litig.,* 149 F.Supp.2d 334, 357 (W.D.Tenn.2001) (the "magnitude of an erroneous financial statement caused by allegedly fraudulent representations, without more, cannot sustain a finding that an auditor acted with scienter"); *see also Reiger v. Price Water House Coopers LLP,* 117 F.Supp.2d 1003, 1013 (S.D.Cal.2000), *aff'd,* 288 F.3d 385 (9th Cir.2002); *In re SmarTalk Teleservices, Inc. Sec. Litig.,* 124 F.Supp.2d 505, 517 (S.D.Ohio 2000). However, a number of courts have recognized that the magnitude of the fraud, while not determinative of scienter, is probative of it. *In re SCB,* 149 F.Supp.2d at 358; *In re MicroStrategy Inc. Sec. Litig.,* 115 F.Supp.2d 620, 651 (E.D.Va.2000); *In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 21 (D.D.C.2000); *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324, 1339 (N.D.Ga. 1998); *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997); *see also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 608 (D.N.J. 2001) (aside from a violation of GAAP, other circumstances suggesting fraudulent intent can include the presence of red flags and the magnitude of the alleged fraud).

In this case, Plaintiffs do not rely on the magnitude of the restatements alone to establish scienter, and we accordingly will consider the factual allegation in conjunction with Plaintiffs' others. In light of our determination that PwC is only potentially liable for the misstatements contained in its fiscal year 1998 and fiscal year 1999 audit opinions, we are mindful that the bulk of the total readjustment in this case applied to fiscal year 2000. Notwithstand-

ing this fact, the fiscal year 1998 and 1999 restatements were not insubstantial. For fiscal year 1998, Rent–Way originally reported a $1,838,000 net loss and a $0.09 loss per share. As restated, Rent–Way reported a $5,819,000 net loss and a $0.29 loss per share. For fiscal year 1999 the discrepancy was even more significant. In its original filing, Rent–Way reported $14,583,000 in net income, and earnings per share of $0.66. As restated, Rent–Way reported a net loss of $765,000 and earnings per share of $0.04. Rent–Way 10–K Annual Report for Fiscal Year Ended September 30, 2000. We are satisfied that the magnitude of the fraud and the duration of the irregularities (spanning two fiscal years) are such that it is reasonable to find them probative of scienter.

### B. GAAP and GAAS Violations

In *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712 (3d Cir.1996), the Court of Appeals for the Third Circuit affirmed the district court's conclusion that the plaintiffs failed to state a securities fraud claim based on allegations that Price Waterhouse violated GAAS and failed to comply with GAAP in the course of performing its 1988 and 1989 audits of Westinghouse. The court observed that although plaintiffs had cited various GAAS standards, they failed to explain "how Price Waterhouse knowingly or recklessly violated those standards in performing its 1988 and 1989 audits." *Id.* The court also found that plaintiffs had not alleged facts giving rise to an inference that Price Waterhouse had known or was reckless in failing to know that Westinghouse's financial statements did not comply with GAAP. *Id.* The district court had concluded that the only factual allegations relevant to Price Waterhouse pertained to its 1990 audit. In instances where plaintiffs have pled facts explaining how the standards were recklessly or consciously violated, however, courts have found them probative. *See, e.g., In re MicroStrategy*, 115 F.Supp.2d at 651–652

(allegations that PwC violated simple accounting principles which resulted in significant false reports probative of scienter); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 629 (E.D.Pa.1999) (numerous, specific violations of GAAP and/or GAAS, when coupled with other red flags, may suffice to plead scienter); *In re Sunbeam*, 89 F.Supp.2d 1326, 1345–1346 (S.D.Fla.1999) (specific allegations of GAAS violations, including allegations that accountant ignored red flags that should have caused it to obtain additional information, failed to properly plan and supervise its audit, and failed to fully understand its client's internal control structure, combined with other allegations to demonstrate that the accountant knew or was severely reckless in not knowing that its client was committing accounting improprieties).

■ Here, we find that Plaintiffs have alleged specific facts explaining how PwC recklessly or consciously disregarded GAAS in the course of its fiscal 1998 and 1999 year-end audits. Central to the allegations in this regard is that PwC conducted its audits without obtaining adequate detail and documentation in violation of GAAS and consequently failed to detect non-standard journal entries made by Rent–Way personnel. Am. Cmplt. ¶ 79. Specifically, Plaintiffs allege that PwC never obtained adequate documentation of Rent–Way's rental merchandise depreciation expenses (the second largest category of expenses on the ledger) because Rent–Way's accounting systems did not record it accurately, and that PwC never obtained adequate documentation of Rent–Way's vendor rebate expenses because the company never recorded these expenses at all. Am. Cmplt. ¶ 79. The court in *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F.Supp.2d 589, 606–08 (D.N.J.2001), found similar allegations probative of

scienter. ("The complaint asserts that E & Y failed to obtain sufficient competent evidential matter to form a basis for its unqualified reports ... Plaintiffs charge that E & Y failed to obtain direct evidence in connection with CUC's and CMS's recording of revenue and elimination or reduction of expenses as a result of write offs of merger reserves. Instead, E & Y relied largely on management's representations ... when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter."). Plaintiffs also allege that in spite of its knowledge of the specific deficiencies in Rent–Way's accounting systems, PwC failed to expand its audit procedures in violation of GAAS. Am. Cmplt. ¶¶ 89, 95. These allegations of GAAS violations are distinguishable from the allegations in *In re Westinghouse* and *Zucker v. Sasaki*, 963 F.Supp. 301, 307 (S.D.N.Y.1997), also relied on by PwC, because they set forth with particularity how PwC consciously or recklessly violated GAAS in the course of its 1998 and 1999 fiscal year-end audits, and support a strong inference that PwC either knew or was reckless in not knowing that Rent–Way's financial statements did not comply with GAAP.

### C. Knowledge of Weaknesses in Rent–Way's Internal Accounting Structure

■ As with the other categories, blanket allegations of weak internal controls do not alone suffice as a basis for inferring scienter. *Reiger v. Price Waterhouse Coopers LLP*, 117 F.Supp.2d 1003, 1009 n. 5 (S.D.Cal.2000), *aff'd*, 288 F.3d 385 (9th Cir. 2002) (boilerplate allegation of weak internal controls did not meet the particularity and strong inference requirements of the PSLRA). However, we agree with the court in *In re Ikon Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 630 (E.D.Pa. 1999) that allegations that an accountant's internal audits "gave it a deep understanding of the existence and significance" of its client's problems and of facts suggesting the accountant knew that the problems persisted until the time of its unqualified audit opinion are probative.

Plaintiffs make just such allegations in this case. It is alleged, for instance, that PwC knew that Rent–Way's Point–of–Sale ("POS") system, in place until the last month of fiscal year 1999, failed to properly record critical rental merchandise depreciation values. Am. Cmplt. ¶ 37. Plaintiffs also allege that PwC knew that this system was especially ill-equipped to handle Rent–Way's rapid expansion and was easy to manipulate. Am. Cmplt. ¶ 36. It is alleged that PwC urged Rent–Way to install the PeopleSoft system in August of 1999 and that this system failed to interface with the POS system and permitted entries to be manually altered. Am. Cmplt. ¶ 39. Plaintiffs allege that PwC knew that Marini made manual adjustments to the ledger in order to force the bottom line numbers to balance at the end of fiscal years 1998 and 1999. Am. Cmplt. ¶ 45, 77. We find that these allegations are of the requisite particularity and that they, similar to the allegations in *In re Ikon*, paint a picture of PwC as knowledgeable about the significant problems in its client's internal control systems and as having reason to know that these problems were occurring when it issued its unqualified audit opinions. Accordingly, we find that Plaintiffs' claims regarding PwC's knowledge in this respect are probative of scienter. *In re Ikon*, 66 F.Supp.2d at 632.

### D. Disregard of "Red Flags"

When plaintiffs "allege the existence of specific facts that should put defendants on notice of errors in recognizing revenue or indicate reasons to question management's representations," a refusal to react to these "red flags" can support a strong

inference of scienter. *In re SCB Computer Technology, Inc. Sec. Litig.*, 149 F.Supp.2d 334, 363 (W.D.Tenn.2001) (*citing In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 547 (6th Cir.1999)). Here, Plaintiffs allege that the following constitute red flags ignored by PwC: (1) the weak internal accounting controls at Rent–Way; (2) the improperly functioning software systems; (3) the fact that Marini manually adjusted entries on the general ledger; (4) the inadequate ledger detail; and (5) the reports of declining expense ratios during times of rapid growth. Am. Cmplt. ¶¶ 77, 79, 88, 100, 101. Although they do not identify it as a "red flag," Plaintiffs also allege that Colleen Kipfstuhl, a PwC employee assigned to Rent–Way's fiscal 1999 year-end audit, confronted Morgenstern about Rent–Way's "accounting irregularities and lack of adequate accounting documentation" in the course of the audit, and was subsequently removed by Rick Krause, the PwC partner in charge of the audit, at Rent–Way's request. Am. Cmplt. ¶ 80. Plaintiffs allege that Krause was good friends with Marini and that he interviewed for the position of Chief Financial Officer at Rent–Way while he was in charge of Rent–Way's audits. Am. Cmplt. ¶ 81.

At the outset, we are satisfied that the Kipfstuhl allegation is more than sufficient to qualify *at least* as a "red flag" insofar as a theory of recklessness is pursued. (the allegation is also arguably probative of consciousness). *See In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d 505, 518–519 (S.D.Ohio 2000) (allegation that auditor informed client that it was reconsidering its position on an already released financial statement but was comfortable with that statement constituted a red flag); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 629 (E.D.Pa. 1999) (allegation of a handwritten note in accountant's file that it had been informed by its client's management that an employ-

ee was cooking the books, if true, would support a claim of reckless behavior); *In re Health Mgmt. Inc. Sec. Litig.*, 970 F.Supp. 192, 203 (E.D.N.Y.1997) (allegation that accountant possessed a letter from an analyst warning that its client had inflated its accounts receivable constituted a red flag). As to the other alleged "red flags," most concern Rent–Way's internal controls and have already been discussed and deemed probative.

PwC also argues, relying on *In re Party City Sec. Litig.*, 147 F.Supp.2d 282, 303 (D.N.J.2001), that the Amended Complaint is deficient because Plaintiffs have not alleged the facts on which their allegations made on information and belief are based. PwC makes this argument with respect to a number of Plaintiffs' allegations, and we address it here only because it is perhaps most strongly advanced with respect to the Kipfstuhl allegation; PwC contends that Plaintiffs are required to disclose its source. We disagree and find that Plaintiffs have complied with the PSLRA in this respect.

The PSLRA requires that "whenever plaintiffs allege, on information and belief, that defendants made material misstatements or omissions, the complaint must 'state with particularity all facts on which that belief is formed.'" *Novak v. Kasaks*, 216 F.3d 300, 312 (2nd Cir.2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000) (*quoting* 15 U.S.C. § 78u–4(b)(1)). Courts have interpreted this provision differently insofar as the revelation of confidential sources is concerned. *See, e.g. Novak*, 216 F.3d at 314 (where plaintiffs rely on confidential sources and other facts, the sources need not be identified if the facts provide an adequate basis for believing that the defendants' statements were false); *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 595–596 (D.N.J.2001)

(adopting the *Novak* standard and finding that the specificity of plaintiffs' allegations indicated that they had adequately investigated and substantiated them, and consequently, had allayed the PSLRA's concerns about frivolous suits); *cf. In re Party City*, 147 F.Supp.2d at 304 (PSLRA dictates that plaintiffs pleading on information and belief "set forth each and every event, circumstance, confidential informant, employee or others who supply data which leads to the drafting of the complaint.").

We find *Novak* and *Campbell Soup* to be more persuasive on this point. In *Novak*, the Second Circuit observed that although the complaint did not specify every fact upon which the plaintiffs' belief was based, it did identify "with particularity several documentary sources that support[ed] the plaintiffs' belief that serious inventory problems existed during the Class Period itself." *Novak*, 216 F.3d at 313. Here, the documentation supporting Plaintiffs' belief that serious accounting problems existed during the class period could not be more clear; Rent–Way's own 10–K report for fiscal year 2000 disclosed that accounting problems required it to restate its previous financial statements by close to 100 million dollars, as did a number of its press releases. Plaintiffs state that their allegations made on information and belief are based upon investigation by counsel, which included, among other things, review and analysis of Rent–Way's public disclosures, interviews of percipient witnesses, and expert analysis. Am. Cmplt. ¶ 161. Plaintiffs have, in various paragraphs, disclosed that their sources include a former Rent–Way internal accountant, former employees, Rent–Way financial analysts and a Rent–Way staffer. Am. Cmplt. ¶¶ 35, 36, 38, 44, 53. The Amended Complaint further alleges with particularity the extent of PwC's knowledge of and involvement in Rent–Way's accounting practices (*i.e.*, PwC knew that the POS system did not accurately record rental merchandise depreciation, PwC knew that Marini altered journal entries, PwC urged Rent–Way to install the PeopleSoft system), specifies how PwC recklessly violated GAAS in the course of its 1998 and 1999 fiscal year-end audits (*i.e.*, PwC failed to require adequate documentation for items such as rental merchandise depreciation and vendor rebates and failed to expand its audit procedures in light of its knowledge of Rent–Way's weak internal controls), and details a conversation between identified PwC and Rent–Way individuals and a resulting termination action by the PwC partner in charge of the audit.

We find that the specificity of these allegations "strongly suggests that Plaintiffs, without the benefit of discovery, have adequately investigated and substantiated their allegations and, as a result, have allayed the PSLRA's concerns about frivolous and abusive fraud suits." *In re Campbell Soup*, 145 F.Supp.2d at 595–596. As in *Novak*, numerous documentary sources indicate that numerous material misstatements were made during the class period, and we find that the factual allegations offered in support of Plaintiffs' belief are sufficient. Thus, we see no reason to require the disclosure of Plaintiffs' confidential sources in this instance and agree with the Second Circuit that, "[i]mposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000). For all of these reasons, we find that Plaintiffs have alleged sufficient facts to comply with the applicable particularity and information and belief requirements.

### E. Summary

Here, when considered in their totality as they must be, Plaintiffs' factual allegations against PwC support a strong inference of scienter for both fiscal years at issue. The cases upon which PwC relies are inapposite because either the factual allegations in them lack sufficient particularity and/or the plaintiffs in them had not alleged a sufficient combination of independently probative facts. "While it is true that a violation of GAAP will generally not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F.Supp.2d 589, 608 (D.N.J.2001); *see also Zucker v. Sasaki*, 963 F.Supp. 301, 307 (S.D.N.Y.1997). "Other circumstances suggesting fraudulent intent can include the presence of *'red flags'* or warning signs that the financial reports are fraudulent, *as well as the magnitude of the fraud.*" *P. Schoenfeld*, 142 F.Supp.2d at 608 (emphasis in original) (internal citations omitted).

With respect to the 1998 audit opinion, the magnitude of the alleged fraud is documented by the significant discrepancy between the revenues Rent–Way originally reported and the restated amounts. As previously stated, the corrected net loss for the year, $5,819,000, is more than three times the loss originally reported, $1,838,000. In terms of net loss per share, this translates to an actual loss of $0.29 compared to an originally reported amount of $0.09. As other courts have observed, "[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy." *In re Health Mgmt. Sec. Litig.*, 970 F.Supp. 192, 203 (E.D.N.Y.1997) (*quoted in P. Schoenfeld*, 142 F.Supp.2d at 608). Further relevant to fiscal year 1998, Plaintiffs allege that PwC violated GAAP and GAAS by failing to obtain sufficient general ledger detail for major specific expense items such as rental merchandise depreciation and vendor rebates, knew that no breakdown of rental merchandise depreciation was accessible from the POS system in place during that fiscal year, and knew that Rent–Way itself did not keep track of vendor rebates. Am. Cmplt. ¶ 79. It is further alleged that PwC knew and approved of last-minute adjustments made to Rent–Way's ledger at fiscal 1998 year-end. Am. Cmplt. ¶ 45. We find that these allegations are collectively sufficient to raise a strong inference of at least recklessness.

The allegations for fiscal year 1999, when viewed on a sliding scale of inferential strength, are equally if not more compelling. The magnitude of the restatement was greater for this year; net income was restated from a gain of $14,583,000 to a loss of $765,000 and earnings per share were restated from a gain of $0.66 to a loss of $0.04. The allegedly deficient POS system was utilized for most of this fiscal year as well, and Rent–Way began installation of the PeopleSoft system, which allegedly did not interface with the POS system, in the last month of fiscal 1999. The same GAAS violations apply, and Plaintiffs also allege that PwC was aware of numerous, specific problems with the PeopleSoft system, including that it failed to accurately account for invoices, misallocated payroll expenses, and failed to account for fixed assets for the first six months after it had been installed. Am. Cmplt. ¶¶ 42–44. Finally, the Kipfstuhl allegation serves an additional "red flag" for this fiscal year audit opinion.

### 3. Loss Causation

PwC also contends that Plaintiffs have not alleged that any of its misstatements

proximately caused their loss. Under the PSLRA, the "plaintiff shall have the burden of proving that the act or omission of the defendant.. caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u–4(b)(4); *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 883 (2000). In *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir.2000), *cert. denied*, 531 U.S. 1149, 121 S.Ct. 1091, 148 L.Ed.2d 965 (2001), the Court of Appeals for the Third Circuit held that there must be a "sufficient causal nexus between the loss and the alleged misrepresentation." The Court observed that "[w]here the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact and economic loss attributable to that misrepresentation." *Id.* Subsequent to *Semerenko*, the Third Circuit stated that "[i]n *Semerenko*, we equated loss causation with proximate cause ..." *EP Medsystems*, 235 F.3d at 883.

PwC's position on this point concerns the October 30, 2000 press release in which Rent–Way announced that it was investigating accounting irregularities in its fiscal year 2000 financial statements. It contends that because Plaintiffs allege that the stock price plummeted the day after this release but do not allege that the price dropped after the disclosures concerning the 1998 and 1999 financial statements (which were made months after the October 30 press release), Plaintiffs have not alleged that any misrepresentation made by PwC proximately caused their loss. We disagree.

In *Semerenko*, the Third Circuit held that the plaintiff class had:

alleged sufficient facts to show that the alleged misrepresentations proximately caused the claimed loss. The Class contends that it purchased shares ... at a price that was inflated due to the alleged misrepresentations, and that it suffered

a loss when the truth was made known and the price ... returned to its true value.

*Semerenko*, 223 F.3d at 185. In particular, the plaintiffs had alleged that "the misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained ..." and that "[a]s a direct and proximate result of defendants' aforesaid wrongful conduct ..., plaintiff and other members of the Class have suffered substantial damages in connection with their purchases of [the] stock." *Id.* at 186. In formulating its loss causation holding, the Third Circuit relied on *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997), in which the Court of Appeals for the Eleventh Circuit held that the plaintiff class had failed to satisfy the loss causation element at trial. The plaintiffs' expert in *Robbins* had measured their loss according to a drop in stock price that occurred on the day a drastic dividend cut was announced. *Id.* at 1445. The fraud was not disclosed until more than a year after the price drop, however, and the plaintiffs did not claim that the dividend cut was in any way related to the alleged misstatements. *Id.* at 1445.

Here, Plaintiffs set forth in detail the allegedly misleading statements made by PwC during the Class Period in the Amended Complaint, and allege in paragraph 156 that:

[a]s a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Rent–Way securities during the Class Period. The price of Rent–Way's securities declined materially upon the public disclosure of facts which had been previously

misrepresented or concealed as alleged herein.

At this stage in the proceedings, we find that this is sufficient. This case is materially distinguishable from *Robbins* in that the stock price drop here occurred in response to a disclosure of fraudulent conduct, and is also distinguishable from *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F.Supp.2d 680, 689 (E.D.Pa.2001), which granted an accountant's motion for summary judgment when plaintiffs' evidence failed to establish that "the stock decline was caused by anything other than business conditions and operational and management problems."

In this case, it is clear that the stock decline was caused by the revelation of fraudulent conduct and we are unwilling to find that Plaintiffs have failed to adequately allege loss causation against PwC because the initial disclosure did not mention the possibility that accounting irregularities also occurred in 1998 or 1999. Plaintiffs have, as in *Semerenko,* alleged that the decline in price occurred because of the defendants' wrongful conduct and detailed that conduct in their Amended Complaint. We are further mindful that, in contrast to *Robbins* and *In re Ikon,* this issue is before us on a motion to dismiss. In *EP Medsystems,* the Third Circuit observed that the "causation issue becomes most critical at the proof stage. Whether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems,* 235 F.3d at 884. That is the case in this instance. PwC's position goes more toward Plaintiffs' ultimate ability to prove the causal link than to the sufficiency of the pleading. *See Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 67–68 (D.Del.2002) (defendant's arguments that plaintiffs had not adequately alleged loss causation because the stock price in fact rose briefly after an admission of fraud and the allegations did not quantify the amount of the alleged decline in stock price or the amount of an acquisition premium plaintiffs alleged that they were entitled to were fact-intensive and accordingly, were not appropriately decided on a motion to dismiss). Similarly here, we find that the issue of whether Plaintiffs' loss was caused by the removal of inflation attributable to the misrepresentations in PwC's audit opinions, those in Rent–Way's unaudited interim statements or some combination thereof is an issue of fact not appropriately decided on a motion to dismiss. For our purposes, it is sufficient that Plaintiffs have alleged that PwC's misrepresentations directly and proximately caused their loss and have alleged facts demonstrating "some causal nexus between [the defendant's] improper conduct and [their] losses." *EP Medsystems,* 235 F.3d at 884 (quoting *In re Control Data Corp. Sec. Litig.,* 933 F.2d 616, 619 (8th Cir.1991), *cert. denied,* 502 U.S. 967, 112 S.Ct. 438, 116 L.Ed.2d 457 (1991)).

### 4. Conclusion

For the reasons stated above, we find that Plaintiffs' allegations state a Section 10(b) and Rule 10b–5 claim against PwC for the alleged misstatements in the 1998 and 1999 audit opinions issued by the firm itself. Plaintiffs have not stated a Section 10(b) and Rule 10b–5 claim against PwC for any misstatements in Rent–Way's unaudited interim financial statements.

### B. Morgenstern

Plaintiffs' allegations against Morgenstern are as follows. He is the founder of Rent–Way and has been a director of the company, as well as its President and Chief Executive Officer, since its formation. Am. Cmplt. ¶ 14. He knew or recklessly disregarded that the fiscal 1998 and 1999 year-end statements and the quarterly statements for all of 1999 and the first three quarters of 2000 had been manipulated and violated GAAP. Am. Cmplt. ¶ 52. He participated in the day-to-day control

of the company and in the preparation of the allegedly false statements. He was primarily responsible for Rent–Way's communications with securities analysts. Am. Cmplt. ¶ 14. He was actively involved in preparing, reviewing and authorizing the issuance of the company's publicly-reported financial statements, SEC Forms 10–K and 10–Q, annual shareholder reports, financial press releases and other reports. Am. Cmplt. ¶ 14. He signed the annual 10–K reports and the annual shareholder reports for fiscal years 1998 and 1999. Morgenstern made numerous individual statements in press releases to the effect that the financial statements were accurate and that the company was doing well. Am. Cmplt. ¶¶ 117, 121, 126, 129, 133, 140. Morgenstern, along with the other individual defendants, knew that despite the publicly-issued statements, the company's store operations were losing money throughout the class period. Am. Cmplt. ¶ 38. When the PeopleSoft system failed to interface with the POS system, the individual defendants (Morgenstern, Marini, Conway, and McDonnell) directed Rent–Way's accounting and finance personnel to make artificial journal entries so that the books would balance. Am. Cmplt. ¶ 40. Morgenstern, Conway and other senior managers knew about and acquiesced in the improper adjustments because of their desire to meet pre-established, publicly-stated earnings targets. Am. Cmplt. ¶ 45.

The individual defendants also knew that Marini actively manipulated advertising expenses by requesting that Rent–Way's accounting firm alter dates on advertising invoices. Am. Cmplt. ¶ 46. These defendants knew or recklessly disregarded that Marini materially overstated the amounts of vendor rebates to falsely reduce other expenses. Am. Cmplt. ¶ 47. Conway gave Marini his marching orders after developing Rent–Way's financial targets with Morgenstern, and at all times Conway and Morgenstern worked closely together, were close personal friends and were also partners in a residential housing development unrelated to Rent–Way (of which Marini was an investor). Am. Cmplt. ¶¶ 50–51. These two defendants always pressured everyone at Rent–Way "to do whatever needed to be done to increase Rent–Way's stock price." Am. Cmplt. ¶ 51. Morgenstern was informed in October, 1999 by Colleen Kipfstuhl, a PwC staffer then working on the 1999 year-end audit, of accounting improprieties and violations that she had witnessed. Am. Cmplt. ¶ 52. He was further informed by high-level financial personnel within the company of serious accounting problems and violations. Morgenstern turned a blind eye to these warnings. Am. Cmplt. ¶ 52.

In late October, 2000, McDonnell learned that Rent–Way was in danger of violating certain of its loan covenants and Therese Bihler, Rent–Way's treasurer who was then preparing the company's tax returns, discovered that the rental merchandise numbers were irreconcilable. Am. Compl. ¶ 55. On the evening of Friday, October 27, 2000, Morgenstern and McDonnell called Bihler and told her to come into the office the following day. At this meeting, Morgenstern and McDonnell were presented with a stack of journal entries by Cindy Spizarny, the assistant controller, and informed that they had been falsified. Am. Cmplt. ¶ 56. A review of the entries revealed that they totaled approximately $60 million dollars, but Morgenstern expressed at this meeting that something must be missing and determined that the company would disclose a figure in low $30 million dollar range. Am. Cmplt. 56. On Monday, October 30, 2000, Rent–Way issued its press release previously cited announcing that it expected the accounting matters to have an impact of between $25 and $35 million dollars on its fiscal year 2000 financial results.

On November 1, 2000, Rent–Way issued another press release stating that the accounting improprieties were attributable to a "small number of personnel at corporate headquarters" and that the entries appeared to have been made "for purposes of reducing certain costs and operating expenses, and include adjustments to rental merchandise, certain fixed asset write-offs, other operating expenses, and thereby artificially inflating earnings." Am. Cmplt. ¶ 60.

Morgenstern argues that Plaintiffs have failed to allege facts establishing a strong inference of either conscious or reckless misbehavior and that their "group pled" allegations are insufficient. We will discuss in turn why we find each of these arguments unavailing.

### 1. Scienter

As we have stated previously, Plaintiffs may plead scienter by alleging facts that establish a motive or opportunity to commit fraud, or by alleging facts that constitute circumstantial evidence of either reckless or conscious behavior. *In re: Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–535 (3d Cir.1999). We must consider each allegation separately to determine whether it is probative. However, we are mindful that the allegations:

> solely in isolation ... but rather, as a part of the overall factual picture painted by the complaint. If the totality of the circumstances alleged raises a "strong inference" of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by "pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the Court a novel legal theory."

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 631 (E.D.Va.2000) (*citing In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 201 (E.D.N.Y.1997)).

■ As with PwC, Plaintiffs' allegations with respect to Morgenstern's scienter encompass both conscious misbehavior and recklessness. Morgenstern contends that Plaintiffs' allegations of motive and opportunity are insufficient, that knowledge of the deficiencies in the company's internal accounting systems cannot be attributed to him because they do not comprise the "core" of Rent–Way's business, and that Plaintiffs' remaining allegations of GAAP violations and the size of the restatement do not raise a strong inference of scienter. With respect to motive, we agree with Morgenstern. Plaintiffs allege that Morgenstern had a motive to commit fraud to do whatever needed to be done to increase Rent–Way's stock price and that he wanted this, in part, to fund the company's ongoing acquisition program. Am. Cmplt. ¶ 51. This allegation, however, does not identify a particularized, concrete benefit that could have been realized by Morgenstern himself as a result of the false statements and is accordingly insufficient as a matter of law. *See In re MicroStrategy*, 115 F.Supp.2d at 643 (observing that " ... a more particularized motive to commit fraud, one tied to specific circumstances, is not so inferentially ambiguous, and a showing of 'concrete benefits that could be realized by one of the false statements ... may tilt the balance in favor of scienter.' ") (internal citations omitted).

■ Morgenstern's other arguments, however, are unavailing. In *In re Tel–Save Sec. Litig.*, No. 98–CV–3145 1999 U.S.Dist. LEXIS 16800 (E.D.Pa. July 19, 1999), cited by Plaintiffs, the court held that certain transactions that involved misstatements comprised a "significant part" of Tel–Save's business and accordingly, that the CEO either knew or should have known that misstatements were involved. *Id.* at *14. Morgenstern argues that the accounting matters at issue in this case are not a "core" part of Rent–Way's business

and therefore, that knowledge of them cannot be attributed to him. The *Tel–Save* case is inapposite, however, because the plaintiffs did not allege that the CEO had actual knowledge of the fraudulent transactions. *Id.* In our case, Plaintiffs allege that Rent–Way's management knowingly took advantage of the absence of internal controls. They allege that the individual defendants directed accounting personnel to make false accounting entries and that they knew of Marini's alterations. Further, they allege that Morgenstern was directly informed of accounting improprieties on more than one occasion and turned a blind eye.

We also find that Morgenstern's argument that the alleged GAAP violations and magnitude of the fraud are insufficient to raise a strong inference of scienter unconvincing. Like PwC, Morgenstern cites cases for the proposition that GAAP violations or a sizeable restatement, without more, are insufficient to raise a strong inference of scienter. *In re SCB Computer Technology, Inc. Sec. Litig.,* 149 F.Supp.2d 334, 353 (W.D.Tenn.2001); *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999). We agree with this proposition, but find that it is inapplicable here. In addition to the significant GAAP violations alleged and the size of the restatements, Plaintiffs have alleged with particularity how Morgenstern was aware of the fraud and the role that he played in it. Although Plaintiffs' allegations concerning GAAP violations and the magnitude of the fraud are not alone sufficient, as we have already discussed with respect to PwC, they are themselves particularized and probative. As the court in *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620 (E.D.Va.2000) observed concerning allegations of GAAP violations against company defendants:

> [i]n this case, however, the Complaint goes well beyond merely alleging that MicroStrategy misapplied accounting principles that, consequently, the Company had to restate its financials. It does so by alleging in some detail the magnitude of the restated financials and the pervasiveness and repetitiveness of MicroStrategy's GAAP violations; the simplicity of the accounting principles violated in this case; and the importance of the contracts involved. This contextual background serves to amplify the inference of scienter to be drawn from MicroStrategy's GAAP violations and restatement of financials.

*Id.* at 636. Here, for reasons we have already set forth in our discussion of PwC, we are satisfied that Plaintiffs' allegations of GAAP violations are sufficiently particularized to be probative, albeit not determinative. As in *MicroStrategy,* Plaintiffs have provided context to these allegations by setting forth in some detail the magnitude of the fraud and the pervasiveness of the violations. We note that with respect to the individual defendants who are not, like PwC, limited to liability for the 1998 and 1999 audited statements by reason of *Central Bank,* the magnitude of the fraud was largest in fiscal year 2000.

Morgenstern also advances arguments concerning the alleged weaknesses in Rent–Way's internal controls, his development of financial targets, and the allegations that he was told of accounting improprieties. In large measure, he argues that Plaintiffs have failed to allege particularized facts in support of their allegations. We disagree. With respect to Rent–Way's internal controls, Plaintiffs have set forth with particularity how they failed to operate and how the individual defendants, including Morgenstern, took advantage of this failure. The allegations in this respect depict a knowledgeable CEO who at least recklessly failed to acknowledge the impact of the weaknesses because of his desire to raise the price of Rent–Way stock. Morgenstern cites *In re Guess?*

*Inc. Sec. Litig.,* 174 F.Supp.2d 1067 (C.D.Cal.2001), in support of his argument that Plaintiffs' allegations (and specifically the Kipfstuhl allegation) are insufficiently particularized and lack corroborative facts. In *In re Guess?,* the plaintiffs alleged that "weekly inventory reports," "financial roundtable meetings," and an "inventory control committee" provided company officers with detailed information that they disregarded. *Id.* at 1075. The plaintiffs also alleged that the Director of Internal audit conveyed the information to the individual defendants. The court found that the plaintiffs' allegations were insufficient. It stated that the plaintiffs had provided "no information as to who drafted these reports, what date the key reports or statements were made, what specifically the reports contained, or any other corroborating details." *Id.* at 1076. The court also found that, even accepting that the reports identified problems, the allegations did not demonstrate that they identified problems so significant as to raise a strong inference of recklessness. *Id.*

We do not find *In re Guess?* to be analogous. The plaintiffs in that case essentially contended that the defendants should have been aware that the company had too much inventory by reason of the reports and meetings noted above. In dismissing the complaint, the court contrasted a case cited by the plaintiffs:

> [n]or does *In re McKesson HBOC Inc. Sec. Litig.,* 126 F.Supp.2d 1248 (N.D.Cal.2000) support plaintiffs. Although the district court in McKesson held that the failure to identify the name of sources was not always a pleading failure, the facts pled, including specific conversations corroborated by reports of widespread fraudulent practices were sufficient to state a claim. Here, there is no indication that Guess adopted any policy as egregious as the booking of entirely contingent contracts as sales,

followed by hiding the side letters that established the contingencies.

*In re Guess?,* 174 F.Supp.2d at 1077 (internal citations omitted). Plaintiffs in our case, however, do not merely allege that the individual defendants' statements were contradicted by internal negative reports. Like *McKesson,* the allegations in this case are of a more egregious scheme, the existence of fraud is documented by Rent-Way's own admissions and Plaintiffs have alleged specific facts, such as the Kipfstuhl conversation, that are sufficient to state a claim. "It is possible to identify sources and provide other corroborating details without disclosing the names of sources." *McKesson,* 126 F.Supp.2d at 1271; *see also Novak,* 216 F.3d 300, 314 (2d Cir.2000). In these circumstances, we do not find Plaintiffs' failure to name their confidential sources to be fatal.

### 2. Group Pleading

■■■ We also reject Morgenstern's argument that Plaintiffs' Amended Complaint fails as to him because certain allegations are group pled, referring to, for instance, the "individual defendants." Under the group pleading doctrine, "allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in the day-to-day management of the corporation." *In re Sunbeam Sec. Litig.,* 89 F.Supp.2d 1326, 1340 (S.D.Fla.1999). Since the enactment of the PSLRA, some courts have questioned whether the doctrine remains viable. *Id.* at 1341 (finding that group pleading, while capable of satisfying Rule 9(b)'s particularity requirement, does not apply to the PSLRA's scienter requirements); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998). In *In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d 935 (E.D.Pa. 1999), the court assumed for the purposes of the motion before it that the group

pleading doctrine survived the enactment of the PSLRA, and we choose to adopt this view. We see no reason to find that group pled allegations *per se* cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA, and rather will consider the allegations individually. *See In re PETsMART,* 61 F.Supp.2d 982, 997–998 (D.Ariz.1999) (finding that group pleading doctrine survives the PSLRA but is not a "pass card for conclusory pleadings," and that the plaintiffs had failed to differentiate the defendants' roles in the alleged scheme in that case). Here, for reasons that we have already discussed, we find that Plaintiffs' allegations are sufficiently particularized as to Morgenstern's role and conduct to raise a strong inference that he acted with the requisite scienter.

### C. Conway

During the class period, Conway served as Rent–Way's President and Chief Operating Officer and as a director. Am. Cmplt. ¶ 15. He was asked to resign on December 31, 2000 due to the accounting matters at issue in this case. Am. Cmplt. ¶ 15. He was actively involved in preparing, reviewing and authorizing Rent–Way's financial statements, and signed the 1998 and 1999 annual reports on Form 10–K filed with the SEC as well as the quarterly reports on Form 10–Q for the first three quarters of 1999 and first quarter of 2000. He stated in an April 18, 2000 press release announcing the results for the second quarter of fiscal 2000 that:

> [t]hese results extend our long string of in-line or better-than-expected results and strong sequential gains. During the quarter, our operating margin reached 16.9%, up considerably from the 13.0% in the same quarter last year. This margin increase was achieved while we increased investment in our growth initiatives.

Am. Cmplt. ¶ 129.

Conway's alleged role in the fraud has been alluded to somewhat in our previous discussion of Morgenstern. Plaintiffs allege that Marini "received his marching orders directly from Conway who in turn had developed financial targets together with Morgenstern." Am. Cmplt. ¶ 50. Conway would meet with Marini and his assistant controller at month and quarter-ends to go over the profit and loss statements of the company. Conway would inform Marini of Rent–Way's reporting objectives and Marini would see to it that they were achieved. Am. Cmplt. ¶ 50. Throughout the class period, Conway worked closely with Morgenstern. Am. Cmplt. ¶ 51. The two men had worked together on the company's initial public offering and jointly interacted with analysts and institutional investors. As time passed, Conway became increasingly focused on "selling" Rent–Way to institutional investors and he, together with Morgenstern, exerted tremendous pressure on Rent–Way employees to do whatever needed to be done to increase Rent–Way's stock price. Am. Cmplt. ¶ 51. The allegations against the "individual defendants" that we have set forth previously also apply to Conway.

Conway argues, in similar fashion as Morgenstern and Marini, that Plaintiffs have failed to allege facts raising a strong inference of scienter as to him and that they have failed to allege all of the facts upon which their allegations made on information and belief are based. We agree with Conway that Plaintiffs' allegations do not establish motive as a matter of law and reference our earlier discussion of the motive allegations concerning Morgenstern. However, we disagree with Conway that Plaintiffs' remaining allegations are insuffi-

cient to circumstantially raise a strong inference that he acted with the requisite scienter.

In support of his argument that Plaintiffs have failed to allege facts raising a strong inference of conscious or reckless behavior, Conway relies heavily on *In re: Party City Sec. Litig.*, 147 F.Supp.2d 282 (D.N.J.2001). He asserts that Plaintiffs, like the unsuccessful plaintiffs in *Party City*, seek to impute scienter to Conway by reason of his position in the company. We find that *Party City* is distinguishable. In that case, the plaintiffs sought to establish a strong inference of conscious or reckless behavior against company defendants with conclusory allegations that the defendants knew or were reckless in not knowing that the company's internal controls had failed to keep up with the company's expansion. *Id.* at 315. The court found the allegations to be insufficient because they were based on nothing more than the defendants' positions in the company and a delayed audit. *Id.*

 Initially, *Party City* was not a restatement case and we are again mindful that the pervasiveness of the GAAP violations and the magnitude of the restatements admitted to by Rent–Way are probative of scienter here. However, we do not find that the Amended Complaint, merely alleges that Conway knew or should have known that fraud was afoot because of his position at the company or because of the GAAP violations and significant restatements. Fairly read, the Amended Complaint alleges a detailed fraudulent scheme in which Conway participated by instructing Marini to alter the company's books so that earnings targets would appear to have been reached. Notwithstanding Conway's contention that the marching orders allegation is impermissibly vague, we find that in the context of the entire complaint it could not be understood to have any other meaning; we also note that no comparable allegations were made against the officers in *Party City*. We additionally find that the allegations against Conway are sufficiently particularized. Were we to accept the position of Conway and the other individual defendants, it would seem that no securities fraud complaint could survive absent a near-verbatim recital of every conversation and meeting alleged to have taken place. We are unwilling to make this a requirement and find that Plaintiffs' allegations in this regard are sufficiently specific so as to satisfy the pleading burdens imposed by Rule 9(b) and the PSLRA and to raise a strong inference of at least recklessness. Here, Plaintiffs allege the how, what, when, where and why of the meetings at which Conway allegedly directed Marini to falsify Rent–Way's ledger. As with Morgenstern, Plaintiffs have set forth factual allegations against Conway that. depict that he had a very substantial and specific role in the alleged fraudulent scheme. Finally concerning Conway, for the reasons we have previously set forth in our discussions of PwC and Morgenstern, we find that Plaintiffs have alleged sufficient facts upon which their allegations made on information and belief are based.

### D. Marini

Plaintiffs' allegations against Marini are extensive. He served as the Controller and Chief Accounting Officer of Rent–Way throughout the class period, and was asked to resign as a result of the accounting improprieties that form the basis of this action. Am. Cmplt. ¶ 16. He signed the annual 10–K report for fiscal year 1999 as well as the quarterly 10–Q reports for the first three quarters of fiscal year 1999. Am. Cmplt. ¶ 16. He made false adjustments to the company's ledger right up until quarter-end and year-end cut off-dates for a number of accounts, including but not limited to rental merchandise, ad-

vertising, depreciation, acquisition accounts, insurance, fixed assets, inventory and rebates. Am. Cmplt. ¶ 45. He made such adjustments at the ends of fiscal years 1998 and 1999. Marini spoke openly about the adjustments and kept track of them on a marker board in his office. Am. Cmplt. ¶ 45.

Marini also would request that Rent–Way's advertising company alter dates on advertising invoices so that Rent–Way could fraudulently overstate the amount of its prepaid expenses. Am. Cmplt. ¶ 36. He, along with James Violi, Rent–Way's Director of Purchasing, controlled the company's vendor rebate program. Am. Cmplt. ¶ 47. Marini overstated the amount of vendor rebates in order to reduce other, unrelated expenses on the company's ledger. For instance, Rent–Way would record that it paid a certain price for merchandise but would not incorporate the amount of the vendor rebates and then would use the "overpay" amounts to reduce other expenses. Am. Cmplt. ¶ 47. Rent–Way kept little or no documentation of its vendor rebates.

Based upon reporting objectives relayed to Marini by Conway, Marini would at month-end and quarter-end arrange with his assistant controller, Cindy Spizarny, to make the necessary false entries. Am. Cmplt. ¶ 50. At all relevant times, Marini and Spizarny kept tight control over Rent–Way's accounting information and refused to provide detail to anyone. Am. Cmplt. ¶ 50. When Marini discovered that Kipsftuhl had gone to Morgenstern about the accounting improprieties, he insisted that PwC's engaged partner and his good friend, Rick Krause, terminate her. Am. Cmplt. ¶ 52. Some PwC employees inter-

nally concluded that the accounting firm had "delegated" its responsibilities to Marini. Am. Cmplt. ¶ 53.

In his motion, Marini purports to incorporate the arguments made in the briefs filed on behalf of Morgenstern, McDonnell and Conway. At oral argument, his attorney contended that the Amended Complaint fails because Plaintiffs, in attempting to plead in the alternative, have pled facts that are inconsistent with each other and have consequently failed to comply with the PSLRA. Hearing on Defendants' Motions to Dismiss held April 9, 2002 at 127–135. He also, however, acknowledged the weakness of his clients' position.[5]

We have little difficulty concluding that the Amended Complaint satisfies all applicable pleading requirements regarding the Section 10(b) and Rule 10b–5 claim against Marini. The allegations are detailed and particularized and clearly set forth the "who, what, where, when and why" required by Rule 9(b). Similar to Plaintiffs' allegations concerning Morgenstern and Conway, Plaintiffs' allegations against Marini detail his role in the fraud and identify specific actions he took in its furtherance. These allegations are again far from conclusory and rather are immensely fact-specific. In this respect, Plaintiffs have detailed how Marini orchestrated the false statements by identifying the ledger entry categories he manipulated and falsified. They have alleged the times when he made the false entries. They also allege that he engaged in such actions knowingly at Conway's direction. To this extent, we reference our previous discussions of the adequacy of Plaintiffs' factual allegations in terms of particularity and in setting

---

**5.** Marini's attorney stated at one point that, "[t]hat's why I say I'm at a bit of a disadvantage because just about everybody seems to agree that financial records have been manipulated to misstate earnings for an allegedly improper purpose, which I think gets you buy a motion to dismiss, perhaps, at least with respect to my client." Thieman at Hearing on Defendants' Motions to Dismiss held April 9, 2002 at 131.

forth the information upon which their allegations made on information and belief are based. It is clear, in our view, that the allegations against Marini are sufficiently particularized and amply supported by factual contentions that give rise to a strong inference of scienter.

### E. McDonnell

■■■ Plaintiffs allege that McDonnell served as Rent–Way's Vice–President and Chief Financial Officer since February 1, 2000 and signed the company's quarterly reports filed with the SEC on Form 10–Q for the second and third quarters of fiscal year 2000. Am. Cmplt. ¶¶ 17, 132, 137. Plaintiffs also allege, inconsistently, that McDonnell reviewed Rent–Way's quarterly report for the first quarter of fiscal year 2000 filed with the SEC on January 21, 2000. Am. Cmplt. ¶ 128. He had no experience in financial or cost accounting and accordingly was unable to provide any genuine oversight to the company: Marini and Spizarny tightly controlled accounting procedures. Am. Cmplt. ¶ 53. McDonnell signed a Form 8–K with the SEC which attached a September 21, 2000 press release that allegedly contained false and misleading information. Am. Cmplt. ¶ 142. Toward the end of October, 2000, McDonnell learned that Rent–Way was in danger of violating certain of its loan covenants and asked Cindy Spizarny, the assistant controller, to provide him with financial and accounting information; Spizarny attempted to avoid his request. Am. Cmplt. ¶ 55. With Morgenstern, he called Therese Bihler, Rent–Way's treasurer, at home on the evening of Friday, October 27, 2000 and asked her to come into the office the following day. At this meeting, Spizarny presented a stack of fraudulent journal entries totaling near $60 million. Am. Cmplt. ¶ 56. The following Monday, October 30, 2000, Rent–Way issued the first press release announcing the fraud and estimating that it would ultimately have a negative, non-cash impact of be-

tween $25 million and $35 million on fiscal year 2000 earnings. Am. Cmplt. ¶ 57. McDonnell stated in a May 24, 2001 press release that the expected year-end 2000 adjustments included increased insurance expense accruals, payroll and vacation expense accruals, reflection of accounting treatments for certain acquisitions, and a one-time idle inventory write-off. Am. Cmplt. ¶ 71. Aside from these allegations, McDonnell is not otherwise mentioned by name in the Amended Complaint.

We find that Plaintiffs have failed to allege facts giving rise to a strong inference that McDonnell acted with the requisite scienter. As with each of the other individual defendants, Plaintiffs have failed to allege motive as a matter of law because they have not identified with particularity a concrete benefit that would have been realized by McDonnell as a result of the false statements issued by Rent–Way after the commencement of his employment. *See In re MicroStrategy,* 115 F.Supp.2d 620, 643 (E.D.Va.2000). We also find, however, that Plaintiffs have failed to allege facts that raise a strong inference that McDonnell acted either consciously or with the high degree of recklessness required by *Advanta.* In contrast to each of the other individual defendants, Plaintiffs have not alleged facts concerning McDonnell demonstrating that he knew of the fraud or that he had a significant role in its perpetuation. It is relevant to our conclusion on this point that McDonnell obtained his position as an officer of Rent–Way so much later than the other individual defendants and that he is alleged to have been in over his head. More critically, however, the allegations against McDonnell are not nearly as specific or particularized as the allegations against the other individual defendants and do not support a strong inference that McDonnell's actions involved "not merely simple, or even inexcusable negligence, but an extreme departure from

the standards of ordinary care ..." *In re Advanta*, 180 F.3d 525, 535 (3d Cir.1999) (*quoting McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979)) (*quoting Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977), *cert denied*, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1999)). Thus, pursuant to the heightened pleading standards applicable to Plaintiffs' Section 10(b) and Rule 10b–5 claims, we will grant McDonnell's motion to dismiss this claim against him.

### F. Rent–Way

 Rent–Way's arguments in large measure mirror those made by the individual defendants. In fact, the bulk of Rent–Way's brief addresses the adequacy of Plaintiffs' factual allegations relating to conscious or reckless misbehavior. Memorandum in Support of Rent–Way's Motion to Dismiss [Doc. No. 61] at 14–28. We have already discussed these allegations extensively and will not do so again here. The parties do agree that the fraud of an officer or employee is imputable to the corporation when the officer or employee commits the fraud: (1) in the scope of his employment, and (2) for the corporation's benefit. *Official Committee of Unsecured Creditors v. Lafferty & Co., Inc.*, 267 F.3d 340, 358 (3d Cir.2001); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir.2001); Plaintiffs' Memorandum of Law in Opposition to the Motions to Dismiss Filed by Rent–Way, Morgenstern, Conway, McDonnell and Marini [Doc. No. 73] at 47–48; Rent–Way's Memorandum at 22. At oral argument, counsel for Rent–Way conceded that if this test is satisfied as to even one of the individual defendants, imputation is warranted. Hearing on Defendants' Motions to Dismiss Held April 9, 2002 at 151. In its brief, Rent–Way focuses on Marini and argues that his conduct cannot be imputed to Rent–Way because his actions were not taken for the benefit of the company. Rent–Way's Memorandum at 22. Under the adverse interest exception to the rule of imputation, "the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation." *In re Cendant Corp. Sec. Litig.*, 109 F.Supp.2d 225, 232 (D.N.J.2000) (*quoting Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir.1993)).

We are unwilling to find as a matter of law that the adverse interest exception precludes holding Rent–Way liable for the allegedly fraudulent conduct of Morgenstern, Conway or Marini. The Amended Complaint alleges that the alleged fraudulent scheme was devised and carried out in order to raise the price of Rent–Way stock and in turn, to fund the company's rapid growth through acquisitions. These allegations are clearly distinguishable from, for example, allegations that a corporate officer misappropriated corporate funds for his or her own use, a clear example of conduct adverse to the interests of the employer. *See In re Cendant*, 109 F.Supp.2d at 232 (citing cases). Here, Plaintiffs do not assert that the scheme was concocted and executed to benefit the individual defendants at the expense of Rent–Way but rather, that it was intended to benefit the company by permitting it to grow. Accordingly, because we determined earlier in this opinion that Plaintiffs have stated a Section 10(b) and Rule 10b–5 claim against three Rent–Way officers and now find that the adverse interest exception does not as a matter of law preclude holding Rent–Way liable for the actions of these officers, the company's motion to dismiss will be denied.

### 2. Section 20(a)

 In Count II, Plaintiffs allege that each of the individual defendants were "control persons" of Rent–Way and therefore violated Section 20(a), 15 U.S.C. § 78t(a), of the Exchange Act. This section provides that:

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled. person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The pleading requirements for a Section 20(a) claim are the subject of some disagreement. It is clear that a plaintiff must allege "(1) a primary violation by a controlled person or entity; and (2) 'circumstances establishing control' of a primary violator." *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 599 (D.N.J. 2001) (*citing In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 940 (D.N.J.1998)). It is also clear that "culpable participation" is an element of a prima facie control person claim. *See Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976) ("secondary liability cannot be found under Section 20(a) unless it can be shown that the defendant was a culpable participant in the fraud."); *see also Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). The dispute is whether culpable participation must be alleged at the pleading stage; McDonnell cites several cases for the proposition that it does. *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 769–770 (S.D.N.Y.2001); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998); *Carpenter v. Harris Upham & Co., Inc.* 594 F.2d 388, 394 (4th Cir.1979), *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979); *In re Twinlab. Corp. Sec. Litig.*, 103 F.Supp.2d 193 (S.D.N.Y.2000); *In re Nice Systems, Ltd. Sec. Litig.*, 135 F.Supp.2d at 584–85; *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371 (S.D.N.Y. 2001); *Dau v. Cephalon*, No. 99–CV–2439, 2000 WL 1469347 (E.D.Pa. Sept.25, 2000). As discussed above, this Court has previously determined that Plaintiffs have stated a Section 10(b) and Rule 10b–5 claim against Rent–Way and therefore have established the first prong, a primary violation by a controlled entity. We must now determine whether Plaintiffs have alleged the second prong and whether, as McDonnell urges, culpable participation must be alleged at the pleading stage. Because we find that the culpable participation question would be dispositive as to McDonnell if answered in the affirmative, we will address it first.

Having reviewed the applicable case law, we conclude that "culpable participation" need not be pled in a Section 20(a) action. *Rochez* and *Sharp* are not pleading cases, and neither is *Boguslavsky*, the Second Circuit case cited by McDonnell. As one district court in Second Circuit observed, it is erroneous to conclude that culpable participation must be pled merely because it is an element of a prima facie case:

> [r]elying on *First Jersey*, some courts, without elaboration, have required the plaintiff to plead culpable participation as an element of a § 20(a) claim—the position adopted by Judge Sweet in dismissing the § 20(a) claim in the related Livent Shareholders' Action ... But further inquiry may be indicated. As noted by Judge Preska in *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065, *7 (S.D.N.Y. Sept.23, 1998), "although the [circuit] court does indeed refer to the elements of a *prima facie* case, *First Jersey* was not a pleading case—it was an appeal from a final judgment after a bench trial .... This distinction between procedural postures is critical."

*In re Livent,* 151 F.Supp.2d at 415. *Boguslavsky* was decided after *First Jersey,* and in it the Second Circuit merely affirmed its earlier holding that culpable participation is an element of a Section 20(a) prima facie case. *S.E.C. v. First Jersey,* 101 F.3d 1450, 1472 (2d Cir.1996), *cert. denied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). After further discussion, the *In re Livent* court required plaintiffs to plead the element, but nonetheless acknowledged that its holding "requiring the plaintiff to plead culpability, at the same time requiring the defendant to prove good faith at trial, engenders an awkward allocation of pleading and proof whereby both parties bear burdens on the same issue." *In re Livent,* 151 F.Supp.2d at 414.

Several courts in this circuit have held that allegations of culpable participation are not required at the pleading stage. *In re Tel–Save Sec. Litig.,* No. 98–CV–3145, 1999 U.S. Dist. LEXIS 16800 at *19–20, (E.D. Pa Oct. 19, 1999); *Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003, 1013 (D.N.J.1996), *In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 600 (D.N.J.2001); *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 940 (D.N.J.1998). Further, some district courts in the Second Circuit have continued to hold that culpable participation is not a pleading requirement after *First Jersey. In re Health Mgmt. Inc. Sec. Litig.,* 970 F.Supp. 192, 205 (E.D.N.Y.1997); *Jacobs, v. Coopers & Lybrand,* No. 99 Civ. 3374(RPP), 1999 WL 101772, *8, 1999 U.S. Dist. LEXIS 2102, at *17–18 (S.D.N.Y. March 1,1999). We find that these cases adopt the better view. As an initial matter, the heightened pleading requirements of Rule 9(b) do not apply to control person claims. *In re Tel–Save,* 1999 U.S. Dist. LEXIS 16800 at *18; *Derensis,* 930 F.Supp. at 1013. Circumstances establishing control need only be pled because "(1) the facts establishing culpable partic-

ipation can only be expected to emerge after discovery; and (2) virtually all of the remaining evidence, should it exist, is usually within the defendants' control." *Derensis,* 930 F.Supp. at 1013 (*quoting Easton & Co. v. Mutual Benefit Life Ins. Co.,* No. Civ. 91–4012(HLS), 1992 WL 136857 (D.N.J. March 29, 1992)).

▮ As applied here, we find that Plaintiffs have made allegations that "support a reasonable inference that [all of the defendants, including McDonnell] had the potential to influence and direct the activities of the primary violator." *In re Health Mgmt.,* 970 F.Supp. at 205. Plaintiffs have alleged that each of the individual defendants had direct and supervisory involvement in the day-to-day operations of Rent–Way by virtue of their positions, ownership rights and contractual rights, and consequently that they had the power to influence and control the particular transactions giving rise to the alleged securities violations that are the basis of this action. Each of these defendants is also alleged to have signed one or more statements filed with the SEC that were eventually restated, and to have had the ability to control the contents of these various statements. At this stage of the litigation, therefore, we find that Plaintiffs have sufficiently alleged both an underlying Section 10(b) and Rule 10b–5 violation by Rent–Way, the controlled entity, and that each of the individual defendants were "control persons" within the meaning of Section 20(a). Accordingly, each of the individual defendants' motions to dismiss the Section 20(a) claim will be denied.

## IV. CONCLUSION

We are mindful that the PSLRA was enacted to forestall a number of abuses of the securities laws, including:

(1) the practice of filing lawsuits against issuers of securities in response to any

significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

*In re: Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir.1999) (*citing* H.R. CONF. REP. No. 104–369, at 28 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 748). In this case, we are satisfied that Plaintiffs' claims allay the concerns of the PSLRA. In addition to the specificity of the allegations themselves, which bespeak a considerable investigatory effort, this is an instance in which the fact of accounting irregularities is established, Plaintiffs have narrowly and specifically identified those persons and entities they believe are culpable, and have extensively alleged facts supporting their claims. Thus, we are satisfied at this stage of the litigation that, with the exception of the Section 10(b) and Rule 10b–5 claim against McDonnell, Plaintiffs' allegations are sufficient to withstand the defendants' motions to dismiss.

### ORDER

AND NOW, this ___ day of July, 2002, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED THAT the motions to dismiss filed by PwC, William E. Morgenstern, Rent–Way, Jeffrey A. Conway and Matthew J. Marini [Doc. Nos. 56, 58, 60, 63, and 69] are DENIED and THAT the motion to dismiss filed by William A. McDonnell [Doc. No. 62] is GRANTED IN PART AND DENIED IN PART.